In the Matter of Edward P. KLUSMAN, Patricia Klusman, Debtors.

The TAPPAN COMPANY, Plaintiff,

v.

Edward P. KLUSMAN, Defendant.

In re Richard L. STARKEY, Martha Mary Starkey, Debtors.

The TAPPAN COMPANY, Plaintiff,

v.

Richard L. STARKEY, Defendant.

Bankruptcy Nos. 1–82–01230, 1–82–01231. Adv. Nos. 1–82–0311, 1–82–0312.

United States Bankruptcy Court, S.D. Ohio, W.D.

April 28, 1983.

Michael G. Kohn, Kohn & Helmer, Cincinnati, Ohio, for plaintiff.

Norman E. Vollman, Milford, Ohio, for defendants.

## FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

RANDALL J. NEWSOME, Bankruptcy Judge.

These are chapter 7 consolidated adversary proceedings in which the plaintiff, The Tappan Company, is contesting the dischargeability of a debt owed to it by debtors/defendants Richard L. Starkey and Edward Klusman under 11 U.S.C. § 523(a)(2). Pursuant to a trial on the merits held on April 12, 1983, the Court hereby submits its findings of fact, opinion and conclusions of law:

### Findings of Fact

1. Richard L. Starkey and Edward Klusman were President and Vice-President, respectively, of Cabinetree, Inc., a now-defunct corporation which was engaged in the retail sale of custom cabinets. One of Cabinetree's largest cabinet suppliers for a number of years was J-Wood, Inc. J-Wood was acquired by plaintiff, The Tappan Company (hereafter referred to as "Tappan") in December of 1979.

2. According to Starkey, Cabinetree, Inc. never showed a profit from the date of its inception until it finally ceased doing business. To the contrary, the company lost money in each year of its existence.

A "cash basis" accounting system was used for determining the company's tax liability, but an accrual method of accounting was used in preparing its financial statements. This dual accounting system was suggested and implemented by Lewis Lee & Company, Cabinetree's outside accountant. By using this method, Cabinetree's financial statements showed the company as having a positive net worth, primarily because of anticipated sales recorded as "contracts receivable—unbilled". Plaintiff's Exhibits 2, 3, 4 and 8. Its tax returns, however, indicated that the company incurred substantial losses. Plaintiff's Exhibit 9.

The evidence stands undisputed that neither of the defendants had anything to do with the preparation of these documents.

3. Cabinetree had a running account with J-Wood both prior to and after its acquisition by Tappan. Payments on this account were significantly in arrears during 1979 as Cabinetree's financial condition steadily deteriorated. Robert Lee, credit manager of Tappan's cabinet group, testified that he was well aware of the company's poor financial condition, and that defendants made no attempt to disguise the company's problem.

4. In lieu of filing litigation to collect on their account, Tappan and J-Wood representatives initiated negotiations with the defendants concerning the satisfaction of the company's debt. Both Robert Lee and Raymond H. Schwartz, independent representative for Tappan's J-Wood division, testified that the negotiations were intended as a "survival effort to salvage what they could" of a bad account.

5. During the course of these negotiations, defendants made it clear that if litigation were filed against Cabinetree, the company would file for bankruptcy. They further stated that the condition of their

personal finances were dependent entirely upon Cabinetree, and that they were presently insolvent.

6. Sometime in early 1980, defendants supplied the plaintiff with a copy of Cabinetree's financial statement for the four months ended March 31, 1979 (Plaintiff's Ex. 2). According to Robert Lee, defendants represented that this was the company's most recent financial statement and that the company's financial picture had not changed since that time. The March, 1979 statement indicates that the company's net worth was $7502. The company's April 30, 1979, and November 30, 1979 financial statements indicate a net worth of $33,-156.00 and $53,115.00 respectively. All three of these figures were arrived at by including future sales into the calculation. These future sales were noted as "contracts receivable—unbilled" in the April and November statements, but were included in "accounts receivable" on the March statement. Each page of the March financial statement sets forth the following caveat: "These statements have been prepared for internal purposes only and do not necessarily include all disclosures that might be required for a fair presentation."

Tappan representatives were also given separate data on prospective sales, and pursuant to their request were permitted to inspect all of Cabinetree's financial books and records. Tappan did not request nor did they receive defendants' personal financial statements.

7. According to Schwartz, there was no mention of financial statements during the discussions at which he was present. To the contrary, the discussions primarily centered upon Cabinetree's prospects for future sales, since all concerned were well aware of its present financial difficulties.

Plaintiff attempted to establish that Schwartz's testimony was tainted with bias arising out of his resignation as one of Tappan's independent representatives. Both his demeanor and his straightforward testimony refute plaintiff's claim of bias. Indeed, any hard feelings which Schwartz harbors would more likely be directed towards the defendants, since their failure to pay their debt to Tappan resulted in a loss of commissions to Schwartz.

8. Plaintiff's negotiations with the defendants culminated in the execution of a promissory note by Starkey and Klusman on July 15, 1980 for $45,014.65, the entire balance due and owing to Tappan (Plaintiff Ex. 1). Tappan required defendants to sign the note on behalf of Cabinetree as officers of the company as well as individually, notwithstanding their assertions that their personal insolvency made their individual guarantees meaningless.

No money or additional credit was given to defendants by Tappan as consideration for this note. After July 15, 1980 Tappan supplied goods to Cabinetree on a C.O.D. basis only. In essence, the only benefit which Tappan gave for the note was its forebearance from bringing a collection suit against Cabinetree. Defendants made payments on the note subsequent to its execution.

## Opinion

■ The principles governing suits under § 523(a)(2)(B) of the Bankruptcy Code are substantially similar to those under § 17(a)(2) of the Act. *See, e.g.* House Report No. 95–595, 95th Cong., 1st Sess. 363 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. The case law is in general agreement that a creditor must prove the following in order to prevail under § 523(a)(2)(B):

1. The debtor made materially false representations in writing regarding the debtor's or an insider's financial condition;

2. The debtor knew the representations were false at the time he made them;

3. The representations were made with the purpose and intention of deceiving the creditor;

4. The creditor reasonably relied on such representations to its detriment; and

5. The creditor sustained the damage alleged as a proximate result of the misrepresentations.

*See, e.g., In re West,* 21 B.R. 872 (Bkrtcy.M. D.Tenn.1982); *In re Whiting,* 10 B.R. 687 (Bkrtcy.E.D.Pa.1981).

 Each of the above-stated elements must be established by clear and convincing evidence, i.e. such evidence as establishes "a firm belief or conviction as to the allegations sought to be established." *In re Hagedorn,* 25 B.R. 666 (Bkrtcy.S.D.Ohio 1982); *In re Whiting, supra,* at 689. As is true of the other exceptions to dischargeability, the exception set forth in § 523(a)(2)(B) must be strictly construed in favor of the debtor. *In re West, supra* at 875.

 When the evidence is judged against the above-stated standards, it becomes apparent that Tappan has failed to meet its burden of proof in certain significant respects.

To the extent that the debtors held forth the March, 1979 financial statement as the most recent one available, and that such statement indicated that Cabinetree had a positive net worth, Tappan has established that the debtors made false representations.

The evidence is less than clear as to whether the debtors knew that these representations were false at the time they were made. As to the first representation, the evidence does not indicate whether either of the debtors were aware that more recent financial statements existed at the time the March statement was presented to Tappan. The financial statements were prepared by Lewis Lee, who was not called as a witness in this case. It is possible that Lee did not provide debtors with the more recent statements; it is possible that debtors had forgotten that those statements existed; it is equally possible that debtors knew full well that those statements existed. The record is unclear on this point, and we will not engage in conjecture.

As to the second misrepresentation, it is obvious that debtors believed that future sales were forthcoming since the "contracts receivable" noted in their financial statements were signed contracts which had not yet been performed. It is equally obvious

that neither was skilled in the subtleties of accounting. Questions of legitimacy as to the method of accounting used to prepare the statements were left to the accountant. Based upon the advice of their accountant, debtors may well have believed that the March, 1979 statement was an accurate representation based upon the principles of accounting utilized. Again, the evidence is at best equivocal on this point.

Even if this Court had a "firm conviction or belief" that defendant made knowing misrepresentations, the evidence is far from convincing that plaintiff reasonably relied upon those misrepresentations. Indeed, the uncontroverted evidence establishes that Tappan was aware of Cabinetree's perilous financial condition. Tappan's knowledge of Cabinetree's problems was undoubtedly the motivating factor for initiating negotiations with the defendants and for requiring that the defendants personally guarantee the July 15, 1980 note.

Tappan's knowledge of Cabinetree's grave condition is further evidenced by the fact that not one, but three members of its credit management participated in those negotiations. It is difficult to imagine that three experienced credit managers from a sizeable corporation would rely upon an unaudited, uncertified, year-old financial statement showing a corporate net worth of only $7502.00 rather than the financial books and records to which they were given access. It is even more difficult to imagine that they would rely upon any financial statement after being told that the company would file for bankruptcy if Tappan brought suit against it, and that the personal guarantees of the two chief corporate officers were worthless because they were both insolvent. Armed with these facts, plaintiff's reliance upon the March, 1979 financial statement was not reasonable. *See, e.g., In re Hagedorn, supra, In re Tashman,* 21 B.R. 738, 741 (Bkrtcy.D.Vt.1982); *In re Hughes,* No. B-1-79-659 (Bankr.S.D. Ohio 1980) (Perlman, J.).

The evidence also fails to disclose an intent to deceive by the defendants. The facts related above establish that defend-

ants fully disclosed their own personal financial problems as well as those of Cabinetree.

The record does not reveal defendants' reasons for representing that the March, 1979 financial statement was the most recent one available. Ironically, the most recent statement available was probably the one dated November 30, 1979. That statement indicates a net worth of $53,115.00, a figure seven times greater than that reflected on the March, 1979 statement. Compare Plaintiff's Ex. 2 with Plaintiff's Ex. 8. If defendants had really intended to deceive plaintiff, it is reasonable to assume that they would have given Tappan's representatives the November statement.

At any rate, defendants' verbal representations of their financial difficulties, their willingness to provide plaintiffs with their books and records, and Robert Lee's own admission that defendants did not attempt to disguise their problems, all lead to the conclusion that defendants did not intend to deceive the plaintiff.

Since plaintiff has completely failed to establish at least two of the five elements of its burden of proof, we need not address the question of whether the misrepresentations were the proximate cause of the plaintiff's damages.

For all of the foregoing reasons, we hereby find in favor of the defendants.[1]

### Conclusions of Law

1. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1471(a) and the December 23, 1982 General Order of the United States District Court for the Southern District of Ohio.

2. Defendants' debt to the plaintiff is not nondischargeable under 11 U.S.C. § 523(a)(2).

---

1. Paragraph 13 of plaintiff's complaint sets forth § 523(a)(2)(A) as an alternative basis for recovery. However, no mention of that section was made during the trial or in plaintiff's post-trial brief. Since reasonable reliance and intent to deceive must also be proven under that sec-

a. Plaintiff has established that the defendants made materially false representations in writing regarding Cabinetree's financial condition;

b. Plaintiff has failed to establish by clear and convincing evidence that defendants made such representations with the purpose and intention of deceiving the plaintiff;

c. Plaintiff has failed to establish by clear and convincing evidence that it reasonably relied on such representations.

3. It is therefore ORDERED that the debt of Richard L. Starkey and Edward P. Klusman to the Tappan Company is determined to be dischargeable and that judgment be entered in favor of the defendants.

IT IS SO ORDERED.

tion, our findings under § 523(a)(2)(B) are equally applicable to plaintiff's claims (if any) under § 523(a)(2)(A). Accordingly, we hold that plaintiff has failed to meet its burden of proof under § 523(a)(2)(A) as well.