**In re Jon Ray COOVER and Anne Elsie Johnson Coover, Debtors.**

**FIRST COLONY LIFE INSURANCE COMPANY, a Virginia corporation, Plaintiff,**

v.

**Jon Ray COOVER, Defendant.**

**Bankruptcy No. 86–02340–BKC–SMW. Adv. No. 86–0689–BKC–SMW–A.**

United States Bankruptcy Court, S.D. Florida.

March 3, 1987.

Leroy Culton, Stroock & Stroock & Lavan, Miami, Fla., for plaintiff.

Samuel L. Heller, Ft. Lauderdale, Fla., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SIDNEY M. WEAVER, Bankruptcy Judge.

This cause came before the Court on January 8, 1987, upon the Complaint of First Colony Life Insurance Company ("FIRST COLONY") for exception to the discharge of Jon Ray Coover (the "Debtor") pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4) and 523(a)(6). The Debtor filed an Answer to the Complaint, and raised as an affirmative defense that the judgment which constitutes the basis of Plaintiff's Complaint was not binding on the Debtor. The Court having heard the testimony and examined the evidence presented, observed the demeanor of the witnesses, considered the arguments of counsel, makes the following findings of fact and conclusions of law:

The Debtor commenced a voluntary proceeding under Chapter 11 of the Bankruptcy Code on August 4, 1986. The case was subsequently converted on the Debtor's motion to Chapter 7. A creditor, First Colony Life Insurance Company, timely filed the subject adversary.

The Debtor, Jon Ray Coover, was the President, Director and a shareholder of Charitable Research Institute, Inc. ("CRI"), a Nebraska corporation which operated in Omaha, Nebraska from November 1, 1978 to June, 1980. The Debtor engaged in the business of income tax and estate planning. The Court finds that the Debtor held 50% of the shares of CRI, with the remaining shares being held by his wife, Anne Johnson Coover.

The Debtor was the chairman of the Board, Chief Operating Officer and a 50% shareholder of Net Economic Tracing, Inc. ("NET"), a Nebraska corporation, which operated at the same location as CRI from November 1, 1976 to June 30, 1980. Furthermore, the Debtor was a 50% shareholder of Key Systems, Ltd. ("KEY"), a Nebraska corporation, which operated at the same location as CRI and NET from November 1, 1978 to June, 1980. All of the remaining shares of stock in NET and KEY were held by the Debtor's wife, Anne Johnson Coover.

On August 26, 1980 (subsequent to the date on which NET and KEY ceased doing

business and on which CRI was officially dissolved as a corporation by the Secretary of State of the State of Nebraska), the Debtor completed an Agency Data Sheet for application to sell insurance as a sub-agent for FIRST COLONY through CRI. Prior to being licensed by FIRST COLONY, the Debtor arranged to sell insurance for FIRST COLONY through Terry Huff & Associates, a general agency with which FIRST COLONY had contracted to sell its insurance. Without the consent, approval or authorization of FIRST COLONY, the Debtor, in some fashion never authorized by FIRST COLONY, obtained Single Case Agreements signed by Terry Huff to enable the Debtor to sell insurance for FIRST COLONY. Paragraph 6 of the Single Case Agreements provides as follows:

> The Broker or Agent IS NOT AUTHO-RIZED to accept any premiums on the policy other than the initial premium, or to alter, modify or discharge any provisions of the policy, to extend the time of payment of any premium, or approve any evidence of insurability. (EMPHASIS IN TEXT)

Using the Single Case Agreements pre-signed by Terry Huff, and holding himself out as a broker or agent, the Debtor completed and signed several insurance applications from purchasers of insurance (the "Purchasers"). The Debtor accepted initial and subsequent premiums from the Purchasers in the amount of $124,706.35, which premiums pursuant to the Single Case Agreements were the property of FIRST COLONY.

The Debtor failed to turn over the premiums paid by the Purchasers to FIRST COLONY, and the Debtor has not accounted for the premiums. FIRST COLONY did not know of the existence of the Purchasers, and could not, therefore, provide them with policies. Most of the Purchasers demanded refunds from FIRST COLONY for the total amount of premiums paid to the Debtor since the Debtor represented to the Purchasers that he was FIRST COLONY'S agent. As a result, FIRST COLONY settled with the Purchasers for the total amount of $110,000.

On December 1, 1982, FIRST COLONY commenced an action against the Debtor, CRI and another defendant in the United States District Court for the Northern District of Iowa, Western Division (the "District Court"), for damages against each defendant for breach of contract, breach of fiduciary relationship and fraud in connection with the sale of insurance. The District Court entered a final judgment against each defendant in favor of FIRST COLONY in the sum of $110,000 compensatory damages and $100,000 punitive damages on January 4, 1985, for a total sum of $210,000.

■ In this Court, the Debtor's principal defense was to attack the findings of the District Court Judge, by asserting that he never applied to become an agent for FIRST COLONY, and that signatures which appear on the Agency Data Sheet and the Applications for Insurance were not his signature. The Debtor sought to have admitted into evidence over one hundred fifty pages of documents containing signatures of the Debtor executed at the time of the transactions complained of to support his defense. FIRST COLONY objected to admission of the documents and filed a Motion to Strike since the Debtor failed to produce the documents prior to trial even though the documents fall within the Request for Production of Documents propounded by FIRST COLONY to Debtor. The Court denies FIRST COLONY'S Motion to Strike and admits all of the Debtor's documents into evidence. The Court finds, however, that the probative value of the documents with respect to any element of the Debtor's case is defeated by the evidence presented by FIRST COLONY.

■ Based upon the testimony of Edward Whittaker who testified as a handwriting expert on behalf of FIRST COLONY, the Court finds that the signature on the Agency Data Sheet was made by the Debtor, and of the twelve signatures which appear on the Applications for Insurance, eight signatures were definitely made by

the Debtor. At a time when CRI was no longer in existence, the Debtor on behalf of CRI applied to become an agent for FIRST COLONY. Without approval of his application, the Debtor, through a dissolved corporation he controlled, accepted money and endorsed checks in the name of CRI even though CRI had no corporate status. As the Chief Operating Officer and a shareholder of CRI, the Debtor manipulated CRI for his own personal gain and must be held personally liable upon obligations of CRI created after its dissolution since the Debtor through use of CRI's name was the principal participant in creating the obligations. 19 Am.Jur.2d Corporations §§ 1382 and 2891, see *Derf Cattle Company v. Colpac International, Inc.*, 463 So.2d 430 (3rd D.C.A.1985), *Orlovsky v. Solid Surf, Inc.*, 405 So.2d 1363 (4th D.C.A. 1981).

■ CRI, NET and Key were vehicles by which the Debtor was able to perpetrate his fraud on FIRST COLONY. All of the corporations were mere shells. At the time of their formation no monies were invested in any of the corporations. The employees of the CRI and NET were identical. NET paid the rent for all three corporations operating at the same location. There was only one telephone number for all three corporations. The Debtor may not use CRI to shield himself from liability due to fraud perpetrated by the Debtor in the name of CRI upon innocent third parties. *Advertects, Inc. v. Sawyer Industries*, 84 So.2d 21 (Fla.1955).

FIRST COLONY offered the Final Judgment of the District Court to establish, through the doctrine of collateral estoppel, that the facts as determined by the District Court are the facts which this court must use to determine if the Final Judgment obtained by FIRST COLONY against the Debtor should be excepted from the discharge.

■ Collateral estoppel is the doctrine by which a party in a subsequent proceeding is bound by findings of fact and law made in a prior proceeding. *Southern Pacific R. Co. v. United States*, 168 U.S. 1, 18

S.Ct. 18, 42 L.Ed. 355 (1897), *Tillman v. National City Bank of New York*, 118 F.2d 631, 634 (2d Cir.1941), 1B Moore's Federal Practice ¶ 0.442 p. 748 (2nd Edition). Four requirements must be met before collateral estoppel effect can be given to a prior action:

1) The issue sought to be precluded must be the same as that involved in the prior action.

2) That issue must have been actually litigated.

3) The issue must have been determined by a valid and final judgment.

4) The determination must have been essential to the prior judgment.

*In re Levitt*, 18 B.R. 595 (Bkrtcy.E.D.Pa. 1982), *In re Mueller*, 34 B.R. 869 (Bkrtcy. D.Colorado 1983).

■ The doctrine of collateral estoppel is applicable to cases to determine the dischargeability of a debt in bankruptcy. *Brown v. Felsen*, 442 U.S. 127, 139 n. 10, 99 S.Ct. 2205, 2213 n. 10, 60 L.Ed.2d 767 (1979). The bankruptcy court has exclusive jurisdiction to determine whether or not a particular debt is dischargeable. "However, that Congress intended the bankruptcy court to determine the final result—dischargeability or not—does not require the bankruptcy court to redetermine all the underlying facts." *Spilman v. Harley*, 656 F.2d 224, 227 (6th Cir.1981).

■ The Court grants collateral estoppel effect to the final judgment entered by the District Court in favor of FIRST COLONY since it meets the requirements of *Levitt.* The requirements of *Levitt* having been fulfilled, the Debtor had a full and fair opportunity to present his case before the District Court. *In re Sloan*, 18 B.R. 1021 (Bkrtcy.E.D.N.Y.1982).

In accordance with the findings of fact, the District Court entered a Final Judgment awarding plaintiff both compensatory and punitive damages against the Debtor. The determination of the District Court that the Debtor took applications and premiums from the Purchasers without having

been licensed by FIRST COLONY and kept the entire premiums without the consent of FIRST COLONY, which fraudulent conduct directly caused FIRST COLONY damages, was essential to entry of judgment in favor of FIRST COLONY in the amount of $110,000 as compensatory damages, and $100,000 as punitive damages.

◼ 11 U.S.C. § 523(a)(2)(A) excepts a debt from discharge "for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by false pretenses, false representations, or actual fraud." The Debtor with actual fraudulent intent, as found by the District Court, withheld and converted premiums from FIRST COLONY in the amount of $124,706.35. The Debtor presented no evidence that he was entitled to keep the premiums. From the documents it is clear that the Debtor knew that FIRST COLONY was relying on any one desiring to transact business under the Single Case Agreements. The Court concludes that the Debtor's intent to defraud FIRST COLONY from the inception of the transaction is clearly established by the fact that the Debtor completed an Agency Data Sheet and Applications for Insurance using the name of CRI at a time when the Debtor knew that CRI was no longer in existence. See *Matter of Madore*, 41 B.R. 282 (Bkrtcy. S.D.Ohio, W.D.1984). Accordingly, the Court shall enter judgment excepting the debt owed FIRST COLONY by the Debtor from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

◼ 11 U.S.C. § 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Through the Agency Data Sheet and the Single Case Agreements, the Debtor held himself out as an agent of FIRST COLONY and obtained the benefits of that relationship even if such relationship was never formally approved. As such, the Debtor engaged in business on behalf of First Colony and thereby became a fiduciary under a duty to do nothing to harm his principal. The Debtor knew that all premiums collected by

him were held by him in express trust for FIRST COLONY and could not be used for his own benefit. *In re Simmons*, 9 B.R. 62 (Bkrtcy.S.D.Fla.1981). The Debtor clearly breached his fiduciary duties. Accordingly, the Court shall enter judgment excepting the debt owed FIRST COLONY by the Debtor from discharge pursuant to 11 U.S.C. § 523(a)(4).

◼ 11 U.S.C. § 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The Debtor diverted premiums belonging to FIRST COLONY and deprived FIRST COLONY of all ownership rights in the premiums. The Debtor's conduct constitutes conversion, the direct result of which was injury to FIRST COLONY. Conversion of property is clearly among the wrongs prohibited by Section 523(a)(6). *Simmons* at 65, *Matter of Graham*, 7 B.R. 5 (Bkrtcy.D. Nevada 1980), 124 Cong.Rec. H 11, 095–6 (daily ed. Sept. 28, 1978); S 17, 412–13 (daily ed. Oct. 6, 1978). By awarding punitive damages to FIRST COLONY in the amount of $100,000, the District Court recognized that under Iowa law the Debtor's conduct in addition to being compensable for actual harm was willful and malicious. *Inman v. Ball*, 65 Iowa 543, 22 N.W. 666, 25 C.J.S. Damages 123(3). FIRST COLONY argues, and this Court agrees, that this heightened standard for awarding punitive damages is at least equal to, if not greater than, the standard for an exception to discharge under Section 523(a)(6). Accordingly, this Court shall enter judgment excepting the debt owed FIRST COLONY by the Debtor from discharge pursuant to 11 U.S.C. § 523(a)(6).

A separate, final judgment excepting the debt owed First Colony by the Debtor in the amount of $210,000 from discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4) and 523(a)(6) will be entered by the Court in accordance with Bankruptcy Rule 9021(a).